Thank you, Your Honors. The virus. Still waiting. All right. I think we have everyone case three for this morning is Mashallah and Rinaldi against West Bend Insurance 21 1507 and we will begin with Mr. Meyer. Thank you, Your Honor and may it please the court. This is William E. Meyer jr. On behalf of the Appalachians and the plaintiffs below Mashallah and Rinaldi. We reserve five minutes for rebuttal. Your Honors. There's three issues. We will address today and those are the exclusion the issue of coverage and the error in dismissing our alternative claims for premium rebate. I'll start with the exclusion the court below aired with respect to the policy exclusion for virus because it essentially blue penciled Illinois insurance law and denied a jury trial on causation. The Park Ridge Presbyterian case is a good illustration of how the procedure should have gone. The result of this was to relieve the carrier of the heavy burden that it must bear on exclusions. This is by every means a key and critical issue for the administration of Justice in insurance cases that involve exclusions. Now the district court looked at this and the language is slightly different in the two policies with respect to the virus exclusions, but by any virus as Mashallah and the other is caused by or resulting from Rinaldi and he thought in the end, it didn't matter which of these various causation standards were used whether it was proximate cause or efficient cause or all sorts of things and I have to say let's take Mashallah first. It's very hard for me to look at these facts and not see at least indirect problems from the virus direct or indirect. I mean, you look at the governor's executive orders and they say because COVID-19 is out there, you know, I'm doing these things and this is all about the SARS-CoV-2 virus. Well, your honor, I you know, I think when we when we have a close reading of the Park Ridge Presbyterian case, we see that in that case there was also this and I think sometimes that is called an anti-concurrent causation language as we're seeing in Mashallah. It's not quite the same language that's absent with respect to Rinaldi, but really what it comes down to is in one way or another this is a causation issue and that causation issue critically is an issue for the jury, an issue for the trier of fact. If there are disputed facts, I mean, there's no rule in Illinois that says you can never have summary judgment on causation issues and here, you know, they're just not that many links in the chain. I'm thinking about the Bozak case. The risk is set in motion, unbroken sequence. It's it goes very directly from from the virus to the order. Well, your honor, certainly, you know, we've seen some of their treatment of this in other cases. We respectfully suggest that their treatment is in error. And in fact, one important way to treat this issue is to read it along with what is critically the burden that the carrier bears, which is to have a clear and free from doubt burden of proof that it carries in order to carry the day on causation. So you make a big deal about that language because the district court said clear and free from ambiguity instead of clear and free from doubt. What's the difference? Well, your honor, the difference really is essentially the court erring by taking a blue pencil to the legal standard, but when you insert a difference, he's saying there's no ambiguity whatsoever. I know what this means. It's clear. So why is that not something that meets the clear and free from doubt? We're not uncertain about this. By the time you look at the meaning of those words, they certainly look synonymous. Well, your honor, we'd respectfully disagree with them being synonymous. Ambiguity is a contractual interpretation buzzword, and I think it was necessary for the district court to blue pencil this language in order to reach the conclusion. It did because it had to read out this issue of clear and free from doubt. Doubt, that word that is present in the burden of proof that the insurer bears. Why doesn't doubt mean I'm not sure? And why doesn't ambiguous also mean I'm not sure? Well, ambiguous is going to the issue of I'm not sure about the contract language. Doubt here is going to these critical and complicated issues of causation, which when we look at the Park Ridge Presbyterian case is as a good example, illustrate to us, there can be a lot of doubts present in the jury issue. Jury issues are there. That case is highly analogous to this one. And first, in a critical point, it was a motion for summary judgment case. Discovery had been allowed, and we're saying that's what ought to happen here, that there should be a remand for discovery. And there were jury issues there of whether water damage was the source of the problem under exclusion. Was it really the electricity that went out on these pumps, these ejector pumps that caused the problem, or surface water exclusions? Was the water coming in from the surface or not coming in from the surface? That, your honors, respectfully is parallel to the doubts, the reasonable doubts, the many doubts that are in place here. Was this loss caused by a public health order, not by a virus? That should be an issue for the jury. So, what the district court says, in his opinion, he says, no matter whether we're using efficient cause, dominant cause, the question is, was COVID-19 simply the dominant cause that set the other causes in motion in an unbroken causal sequence, see Bozek, and then he says, obviously, period. Goes on to explain why he thinks that the causal link between the virus and the order is a very close one. Well, your honors, with all respect to the district court, no matter how smart we all are as lawyers and respectfully as judges, we should have no power to determine key factual issues of causation upon which the entirety of the case... Sorry, your honor. Do I understand correctly then, you want a trial in which you want to argue that Governor Pritzker just completely overreacted to COVID and that there was some independent cause other than the virus that led him to issue these orders. Is that the theory? Well, your honor, I'm by no means showing any disrespect to his honor, the governor, or his actions, but what the points that we are making is that this is a complicated situation. You said that time and again, that it's complicated. I gotta say, it looks to me pretty simple, and I'd like you to tell me what you think is... What's the argument that this had a cause other than the virus? Well, one argument, your honor, is was there a cause here that was most proximate, most efficient due to the public health orders? For example, we're going to shut down certain businesses in order to preserve hospital space. Was the virus... But that was all the virus. Nobody was worrying about hospital space because too many gunshot wound people were coming in or something of the sort. Governor Pritzker, I find it very hard to imagine that Governor Pritzker just woke up one day in March of 2020 and decided, oh, I think I'm gonna shut down all these businesses without a link to COVID-19. His orders themselves say what he was thinking. We don't have to guess. Well, your honor, one critical point on that, however, is what do these policies provide? Do they require that there be a virus on the premises of Michelle or Rinaldi? If so, is that what caused the shutdown or the losses? Or was it the public health orders? Yes, understanding that Governor Pritzker said what he said, did what he did, but ultimately we should allow that determination to be made by a jury and that comes after a close exploration of what really happens here in discovery. So, you know, if you were mapping out a discovery plan, I think Judge Hamilton's asked a very interesting question. What would you be looking for? What would you imagine? What facts could possibly negate the explanation that Governor Pritzker issued these orders because of the virus? Well, your honors, what exactly happens here? How did the virus affect Michelle, a jewelry store? How differently did it affect, if at all, the Rinaldi? If he's not doing his order based on every single small business in Illinois, the governor issues the order because of the data he's getting about the number of people, you know, the test positivity rates at that time were on the upward trend. Of course, they got much worse later, but you know, he was trying to act then, but I don't see a hint of any other reason in this order that's unrelated to the SARS-CoV-2 virus. Your honor, at the end of the day, you know, we respectfully suggest that those issues should be reserved to the jury. This is highly analogous to the Park Ridge Presbyterian case and at least discovered. And where I'm at my five minutes, your honor, you know, there's also another important aspect to this case, which is the premium rebates. Certainly, we've spoken to that at length in our briefs. And with respect to that, this case is set apart with West Bend being a mutual company. Shareholders are the insureds. Fiduciary duties are owed. That certainly makes a difference. I'll reserve the rest for rebuttal, your honor. All right, that's fine. Thank you very much, Mr. Fatala. Good morning, may it please the court. Jason Fatala from Hush Blackwell on behalf of Appalachian West Bend Mutual Insurance Company. Most of that time was just spent on the virus exclusion. So that's where I'll pick up. We were talking about this free and clear from doubt standard that counsel would like the court to have applied below. I agree with Judge Wood that free and clear from ambiguity is synonymous with free and clear from doubt. But even if we go beyond that, I think it's clear that the court below gave this proper consideration. Judge Kokoris expressly incorporated his decision in Riverwalk. That's a short appendix, page 5, and applied it to these facts here. In the Riverwalk case, the court used the exact phrase that counsel would have Judge Kokoris use here, and that is the free and clear from doubt language. So even if this were remanded, we already know exactly that Judge Kokoris would find that there was free and clear from doubt as to whether or not the exclusion applied. We also know that counsel has cited to no legal authority that says the court must use this language, and we cited to numerous decisions at page 15 of our brief where the Illinois Court of Appeals has enforced exclusions without using that particular phrase. I'll also state that Judge Kokoris found that West Bend must affirmatively establish that the exclusions apply, and they concluded that West Bend met that burden. That burden subsumes the burden to show that the exclusion is free and clear from doubt. So by any measure, Judge Kokoris applied the correct standard and reached the correct result. I'll also talk briefly about the causation standards here. There are two slightly different causation standards that apply under the two policies. Mishala has the anti-concurrent cause language, which essentially says it doesn't matter where in the sequence the virus occurs, as long as it is one of the causes, coverage is excluded, even if it wasn't the last, even if it wasn't the dominant, even if it wasn't the only one. Here, I would agree with Judge Wood that it's very easy to draw a line from the virus to the shutdown of plaintiff's premises, so it's pretty clearly at least a cause. Then we have the Rinaldi's policy, which has the efficient proximate cause standard that applies, which is the typical standard that applies under Illinois law. And that applies, as we know from the Bozak Court, the exclusion will apply if the excluded risk is either the dominant cause of the loss, or if it sets in motion an unbroken causal sequence of events that cause the ultimate loss. I would submit to this court that both of those standards are satisfied. It's very hard to divorce the virus from the plaintiff's injuries, and in fact, if we look at their complaint at paragraphs 59 and 72, they state that the orders were placed in an effort to slow or stop the spread of COVID-19, and that the closure orders aimed to save the lives by flattening the curve, which is an obvious reference to COVID-19. Likewise, the executive order that plaintiffs rely upon states that it was implemented in order to slow and stop the spread of COVID-19. So, even under the efficient proximate cause standard, where you look to see if the virus was the dominant cause, or whether it's set into sequence, an unbroken chain of events that led to the loss, I would submit that that's absolutely satisfied here, as the court below found. We also know that causation is not automatically a jury question. There are numerous instances where exclusions have been enforced, including virus exclusions at the motion to dismiss stage, without submitting that issue to the jury. I will talk briefly, switching gears to the coverage issues. Appellants led both of their briefs with this argument, so I'd like to address it, and that is the notion that the court below found that there was direct physical loss over damage. The court below did not find that. The court below did not even consider that issue. Now, ordinarily in Illinois, it's a two-step process when you're looking at an insurance policy. First, you start with the insuring agreement and decide, is there an initial grant of coverage? And if there is, then you look at the exclusions to determine if the exclusions take it away. Judge Kokoris here skipped straight to the second step, but there's nothing wrong with that. First, it's the most efficient way to reach a conclusion. Rather than answering questions related to business interruption, extra expense, civil authority, and then the virus exclusion, the court here was able to dispose of all of the coverage issues by looking at only one issue, and that is the virus exclusion, so it's an efficient approach. And there's nothing remarkable about skipping the first step. Appellants have cited no authority that states that that's impermissible, and we've cited to three cases in the last year alone from the Northern District of Illinois where the court skipped the first step and went to the second step. And besides, we already know exactly how Judge Kokoris feels about these issues. I believe we just had the Bradley Hotel Court case come up, which was another Judge Kokoris case. In that case, Judge Kokoris found that the inability to use portions of the property do not constitute direct physical loss of or damage. We also have the Legacy Sports Barbershop case that was alluded to earlier today, another Judge Kokoris case. In that case, Judge Kokoris actually reversed himself and found that modifications to property do not constitute direct physical loss of or damage. Those are the exact two arguments that plaintiffs are presenting here. They're arguing that alterations to their property to enhance safety and that partial loss of use of the property constitute direct physical loss. We already know how Judge Kokoris feels about those issues, so it's unreasonable to suggest that Judge Kokoris found coverage here where it wasn't even addressed, even though he found that there was no coverage in those other two cases where the exact same arguments are advanced. And I'll submit that that's the right answer. That's the answer that the overwhelming majority of courts have found, and here there have been no allegations of any direct physical loss or total loss. And I would actually like to address for a moment if I could, Judge Wood's question about whether if the perimeter of the building, if access had been restricted either by an order or by the police, whether that constitutes direct physical loss and whether that needs to be permanent. I submit that the loss absolutely does have to be permanent in order for the insuring agreement to be triggered. I don't understand that at all, since it seems to me temporary dispossession, whether it's, you know, because rubble from an earthquake or a tornado is in front of your building or there is a firm public order, you are physically dispossessed of that thing which you own. And if you go with Judge Finerman's hypothetical about the computer where it's personal property, if it's been stolen, you don't have it for a while, even if the police ultimately recover it. So I don't understand why partial but complete dispossession doesn't work. Well, my basis for saying that is the period of restoration definition, which was addressed in the last argument, and that appears in the business income and extra expense sections. It tells us that coverage begins the time of direct physical loss or damage and it ends when the property should be repaired, rebuilt or replaced, or when business is resumed at a new permanent location. So when we're talking about loss of use, the loss of use example we gave where it's temporary, there would be no need to repair the building, there would be no need to rebuild the building or to replace the building, but there would be a need to restore access to the building. You'd have to, you know, bulldoze away the debris or what have you, and it's the restored access that makes the building usable again. Now, I know in those provisions of the policies, care is taken to make sure people don't drag this out for unreasonable amount of time.  I'm going to give a different meaning to the word loss from the meaning you give to the word damage. You could even say that these restoration provisions are primarily directed at damage and perhaps if it's a hundred percent damaged, maybe it's lost too, but there are other ways that the word loss could be understood. Well, I would submit that when we use the phrase when business is resumed at a new permanent location, the implication is that the previous premises is no longer usable and that's why you needed a new permanent location. Sure, I mean, so right, you have a condo in South Florida and it collapses and so you're not going to resume business there. You're going to go to some other place. Right, but there we would have also physical loss as opposed to just simply restricting access without anything having actually happened to the premises itself. So do you think something would happen to the premises if it turned out, I want to think of some example that works, that the radon is seeping up from the floor and so it's just too unhealthy for people to be in those premises. There's no physical change to the premise from the radon gas. If the court would accept that uninhabitability constitutes direct physical damage, then I would submit that that example would be one that triggers the insuring agreement. Okay, but again here we also have the virus exclusion. So even if we get past the direct physical loss over damage component, the virus exclusion comes into play as we just discussed. I think on the coverage issue, if I could just follow up, I guess I'm struggling with why uninhabitability has to be total. You know, maybe it's radon, maybe it's a gas leak or something and authorities say, okay, managers put on a couple of hazmat suits. You can go in and do a couple, you know, turn off switches or make sure the furnace is running or whatever or the air conditioning is running. Is that that little sliver of access result in deprivation of coverage? I would say that it results in deprivation of coverage under the loss of use prong of the direct physical loss over damage, but it could potentially leave the door open for coverage under the direct physical damage component provided that this court were to accept that uninhabitability due to the presence of a dangerous chemical constitutes direct physical loss. Thank you. It sounded like council planned on addressing the premium rebate question. So I just wanted to address those briefly unless there are other questions on the virus exclusion or coverage before I completely switch gears. Okay, great. So we have the two sorts of premium rebate claims. There are the ICF a claims and the unjust enrichment claims just want to briefly walk through them because I think the court below got this exactly right. We know that for the ICF a claims. There are two components. There's deception and unfairness plaintiffs have brought claims under both deception fails because deception requires both a deceptive act that approximately caused plaintiffs injuries here. There could be no deceptive act because we're dealing with two sets of policies one was issued in 2019 before covid had really been on the national radar. So it would be impossible for West Bend to have been deceptive about something that it didn't know about and that was can you remind me which month of 2019? One was issued in August. Because by November in December, there were some rumblings of something going the other was issued in October October. Okay. Thank you, right? So it would have been very difficult to be deceptive about something that West End wasn't aware of and then we have the renewals of those covid was very much on the national radar after plaintiffs had submitted claims to West Bend after West Bend had already denied those claims. So plaintiffs at that point knew very well what West Bend's position was as to insurance coverage for covid. So that too could not have been a deceptive act. We also going to address this mutual insurance company point. They're making about it. Oh sure. Yeah. Yeah, absolutely. So as I understand it, I believe what plaintiffs are saying is that they can bring a claim under unjust enrichment, even though there's a valid contract because what they're alleging is a tort and the tort that they're alleging sounds like it's breach of fiduciary duty and they're claiming that the breach of fiduciary duty or the fiduciary duty itself arose due to the unique relationship of a mutual company between the insurer and the insurance that argument fails on a lot of levels, but I'll zero in on bridge of fiduciary duty because I'm short of time number one. There are no allegations in the complaint that a fiduciary duty existed that it was breached that the business judgment rule was violated or otherwise if there had been any sort of a breach of fiduciary duty, but even setting that aside, we know from this court that whatever rights a member of a mutual company has are delineated by the terms of the policy and come from it alone. The policies here both state that the decision to distribute dividends is left to the discretion of the board of directors. That's at page ID numbers 44 and 188. There is nothing in the contract that states that plaintiffs have a right to distributions or that they can choose when distributions are made the amount that they're made in or any other of the circumstances. So the relief that they seek is simply not provided by the policy now plaintiff site to a couple of cases, but those cases are in opposite because in those cases the decision to issue premiums had already. I'm sorry to redistribute premiums had already been made or it was stated in the policy that distributions would be made and what policyholders were complaining about was that the distributions weren't enough or they were calculated impermissibly, but the right to a distribution had already been made. The last thing I'll say is the existence of a contract does undermine the ability to bring an unjust enrichment claim because they're inextricably intertwined. If there was a totally separate tour claim that didn't depend on the interpretation of the contract, that would be one thing, but that's not the claim here. Unless there are any further questions. I asked the court to affirm and I thank you for your time. All right. Thank you very much. Anything further. Mr. Meyer. You're muted, sir. I'm sorry on rebuttal a couple things to say first in terms of when we look at the governor's line that he drew on essential versus non-essential businesses, the shutdown orders, the affected your business, perhaps more than others based on the nature of the business, which means a jury ought to get to decide whether was this particular business a grocery store, for example, how was it affected? It could stay open versus some of my clients, you know, worrying were we affected just by the shutdown order or by the virus, you one business in a way that is that is one way. Another business in a way that is definitely really what we have here on the virus exclusion really is while contract construction, maybe the province of the court, the factual issues of breach and causation have to be left to the jury, lest there not be any jury trial right left at all in a contract to action. If an insurer is going to make an exclusion that center centers around issues of causation. It's created a jury issue Park Ridge Presbyterian case illustrates the way to deal with that and we would urge your honors to reverse with respect to the virus exclusion issues for that reason alone. Looking at the issues of coverage and ensure it need only show a plausible case for coverage to survive a motion to dismiss many plausible arguments for in cases for coverage have already been heard by your honors, you know, I can emphasize that from the physical impact of social distancing to the alterations to the premises to the prospect that scientific evidence would tell us about had Discovery proceeded how the virus has a physical impact that our complaint is chock-full of plausible theories for coverage. It should proceed into this into the discovery phase on the issue of premium rebates. This is an alternative theory that we pled under rule 8 and if the carriers went on coverage or on the exclusions in this court, then what is going to happen is that the the the insurance companies will have an incredible windfall that will emerge out of the pandemic. That's because they wrote policies that assumed that risks like fires accidents, you name it that those were risks on operating businesses during the pandemic when businesses were not operating. They were either shuttered or operating at a greatly reduced capacity. The risk went down the payouts went down and if we're debating causation, there's also the issue here that a carrier could and we believe would attribute every business income loss to covid does that know your point your point may not be wrong that you know with the downturn in economic activity, which was very considerable for a period. Insurers were perhaps paying out less than they ordinarily will the same thing happens with other kinds of ebbs and flows of economic activity, whether it was the downturn of 2008 or whether it was, you know other times when we've been in a recessionary period and policies are contracts. I mean, they're they're written to assign the risk of those kinds of things to one side or the other and I'm not sure that there's any law that I've ever heard of that says insurance companies have to rebate premiums whenever for some reason a macro event causes payouts to change. Well, your honor what sets this case particularly apart is that West Bend is a mutual company, which means that my clients are more than just insurance their shareholders who are owed fiduciary duties and holding on to those windfalls here. It's a pivotal breach. It's a wrongdoing the breach of fiduciary duty, you know, what is more important than what you do with the money when you're talking about the essence of what a fiduciary duty is West Bend should be accountable to its shareholders who are its insurance boards policyholders for what it does with the windfall Discovery is needed to discover exactly what happened there. I'm sorry, your honor. With mutual insurance companies. Do you think directors might also have a fiduciary duty to ensure that they have adequate reserves if a covered disaster occurs the following year? Absolutely, your honor. No doubt, but the windfall here from this situation would have enriched their coffers in a way that raises these issues of fiduciary duty to the shareholders for rebate of this surplus in the way that it would happen in any other company that would have such a windfall in closing your honors. I see I'm out of time. The request is that you reverse and remands the case should proceed to Discovery and thank you for your time. All right. Thanks to both Council. We will take this case under advisement.